Good morning, Your Honor. May it please the Court, Michael McHugh of the law firm of Lewis & Rocha, representing the appellant, LGS. Your Honors, this case addresses the intersection between copyright law and state contract law. The District Court erred, we believe, in denying LGS's motion for preliminary injunction below, apparently based on the conclusion that LGS is not likely to succeed on the merits of its copyright infringement claim. We believe that the District Court abused its discretion in adopting and applying state contract law principles in a manner that's inconsistent with the Copyright Act and basic principles of copyright law. The District Court implicitly held that a copyright owner cannot withhold consent to use of a copyrighted work in its discretion when the license is conditioned on the copyright owner's express written consent. We believe that this violates two principles of copyright law, which I'll expand on in a moment. The first principle is that exceeding the scope of a copyright license constitutes infringement. And secondly, and more importantly, that a copyright license prohibits any use of a copyrighted work that is not authorized in the license. Did the trial court deny the preliminary injunction as a matter of law or construction of law, as opposed to having some wiggle room on what the fact pattern will actually demonstrate, what some of the oral agreements were between the architect and the builder, what intentions were as far as additional plotting is concerned, what regulatory affairs existed with respect to building permits and the whole nine yards of the business that's involved here? The record is unclear. There were no oral or written findings of facts or conclusions at all. That's the problem I have, and I don't see how on appeal you're going to say that the District Court abused its discretion. But what do you want me to do, go hear the case all over again, make a new set of findings or something? Well, it appears from the District Court's statements that it was holding that LGS could not unreasonably withhold its consent to reuse of the copyrighted plans based on the ---- What's reasonable or unreasonable is not going to be the subject of an injunction. I agree, Your Honor. I believe that that was the basis, I believe, for the District Court's conclusion that LGS is not likely to succeed on the merits of its copyright infringement claim because it was engrafting on the Copyright Act a requirement that a copyright owner cannot unreasonably withhold consent. And our position is that's inconsistent with the Copyright Act. LGS had the absolute right under the Copyright Act and under the contract to withhold its consent to reuse of the plans. And the District Court's engrafting on the Copyright Act, copyright policy on the contract, a state contract law requirement that a copyright owner act reasonably is inconsistent as a matter of law. Contract application in this case, when the use of the plans goes beyond the original plot, right? Correct. We don't know what the facts are exactly as to what's going on. Well, we do know, it's undisputed that the plans were used for plots beyond the original 80. That's undisputed. The copyright license provided for use of the plans. And would you say it's undisputed that there's no present intention to do any more construction under these plans? The representation that was made to the trial court? They have represented that. But part of the injunctive relief we request. Is the injunction going to enjoin future building? Future use of the plans, because it merely indicated an intent not to use, which is insufficient under Ninth Circuit law. But secondly, we had asked for an injunction requiring them to return all the copyrighted plans and all the derivative works that they created using the plans, and they have failed to do so. But with the plans they have and that they have paid for and where they have actually done the building, aren't those plans necessary to some degree for repairs, remodels, additional work? I think they are. Warranty, those kinds of things? I think they are, but I dispute that they've paid for those plans. Those were reused plans that they modified without paying LGS. The reuse fee was in part for reuse of the plans, but also for certain work that LGS was to perform using the plans. They basically have taken LGS's copyrighted work, modified the plans, have failed to return the original plans or the modified plans. Okay. If I were to agree with you and I was to enter an injunction this afternoon, what the hell would it say? I think it would say that, one, LGS is likely to succeed on the merits of its copyright infringement claim and then go through the other factors. And secondly, you would enjoin Concordia from using those plans in the future. You would require Concordia to return the copyrighted plans and any derivative works it created using those plans, which violated LGS's copyrights. They don't have a right to keep the plans so that they can deal with issues that may arise regarding construction of the houses? I think they have a right to keep the original plans, but that's not what they did.  I know that, but I'm asking, if you won, would an injunction require them to return the original plans? Not the original plans. So what would they have to return? They'd have to return the plans that they, the derivative works, the new plans that they created for the second phase. Oh, did they create new plans copying from the old ones? Yes, they had to. When the plans are reused, there are certain requirements. I don't know if they have to. I've never done this. He doesn't violate copyrights. In the original agreement at, and this is excerpts of documents. I'm asking you something physical. I mean, I've never been a project manager for a trapped housing construction project. I don't actually know what you do with the plans. I'm thinking, you're going to have some homeowners who complain my house has this defect and that defect. Sure. And they have to be able to look at the plans in order to adjudicate the dispute if they go to court. That's correct. And they'd have to have the original plans for phase one, which are the plans that LGS provided. But they also would have the derivative works, the new plans they created from LGS. So that's what they do? They create new plans? Right. In excerpts of record 28 shows what a reuse would require. That doesn't tell what they do physically. See, I'm trying to find out. Do they use a giant Xerox machine and Xerox the plans and hand them out, and you want the copies back? I'm trying to figure out physically what you want. I understand. Physically, we want the new plans that they created using LGS's plans for subsequent phases of the project. All right. We have Arbor. Arbor Glen 1. Glen 1. We have Arbor Glen 2, and we've got Town Center, right? Well, Arbor Glen 1 was the original contract, and then I think the — Your position is that the plans were limited only to Glen 1. Correct. I think that's undisputed. Nevertheless, they went ahead and did Glen 2. Correct. All right. And you want the Glen 2 plans, in effect, back. Yes. Is that right? That's right. Okay. Now, what about Town Center? I believe Town Center was a different name for Arbor Glen 1. Oh, okay. I see. All right. Could you tell me something about the $3,600? The way it looked to me from the record, and I want you to educate me if I misunderstood, is the deal is, reuse fee, $3,600 plus $60 per unit plotted. They started using the plans, and they either offered or paid, I forget which, $60 per unit plotted. Correct. That's what they said. And you said, give us — there are four plans. Give us $3,600 times four. Correct. They said, oh, we'll pay the additional $3,600 once, but not four times. But they never actually sent a check for the $3,600. Have I got that right? Yes, with one exception. We dispute that they ever tendered the $3,600. They tendered the $60 per unit plotted. Well, tendered is a legal word. It's not really a factual word. What physically happened? They sent a letter. They sent a letter saying they would pay $3,600. Saying that we will pay $60 per unit plotted. And they sent a check for $60 times 181. And then we wrote back and said, you also owe $3,600 times four. They sent a check for $60 times what? Times 181. 181. We demanded $3,600 times four. If you look at ER 55 and 56, that's the letter transmitting $60 times 181. Got that. And then, but they never sent a check either for $3,600 or $3,600 times four. Correct. But they said they'd be willing to pay $3,600. They claim that they said that. We dispute that they ever said that. Oh, they never sent a letter saying they'd pay that? No. What's the theory for multiplying by four? Four different variations. There's four different plans. There's $3,600 as a base reuse fee per plan. And that was based on the course of dealing between the parties. This was the third reuse project between the parties. And the base reuse fee was always calculated per plan, not for the project as a whole, because there's a certain amount of work that needs to be done to modify each plan for the new reuse. Now, tell me, why when the architects, they accepted the check for $60 times 181 and deposited it, right? They took the money? They sent it back. Oh, they did send back that check? Yes. ER 58, 59, and 60, letter from Ted Price to Concordia Homes, please find checks in the amount of two different checks totaling the $60 per unit. So they did not accept that money? Correct. And informed Concordia Homes that they must cease and desist using the plans beyond the 80 initial units, because they failed to pay the reuse fee and obtain express written consent from LGS. So we can see that there's a factual dispute regarding whether the reuse fee, the proper reuse fee was paid or not. What we're relying on is that there are basically two conditions to reusing the plans. One was payment of the reuse fee, but secondly was the express written authorization from LGS. And under the Copyright Act, under Section 106. Did the architects send a letter saying, you have to pay us $3,600 times four plus $60 per unit to reuse the plans? I believe so. I sort of remember a letter like that in the record. I believe so. Why isn't that letter written permission to use the plans so long as you pay the money? Well, if I can refer you to ER 57. That's I think what the correspondence you're talking about. LGS says that Concordia Homes is not authorized to proceed with any more additional units under the agreement upon tendering the additional sum of $3,600 times four, Concordia Homes shall receive permission to proceed per the licensing agreement. So LGS did not give authorization but would have given authorization upon payment of the full reuse fee. But it's our position that LGS was entitled to withhold permission to reuse the plans and its discretion pending payment of the reuse fee. Otherwise, you can have copyright licensees, software, whatever copyrighted work, basically reusing, exceeding the scope of their licenses at will, even when there's a license that prohibits them from using the works outside a certain scope. And the copyright owner is stuck, basically. In this case, it appears that the district court would limit the copyright owner to just contract damages as opposed to having the hammer of the Copyright Act. I'm missing something here. This is a dispute somewhere between $3,600 and $14,000. In all this high-priced legal talent around here, there must be something else out there. Are there damages under some statute? What's going on? Under the Copyright Act. Really, to answer your question, there's two elements here. One is the money and, secondly, is the principal. And this is a standard. That's misspelled L-E, not A-L. This is a standard American Institute of Architects contract. I always thought principal was spelled with a dollar sign. I thought maybe this was the Architects Association defending its AIA standard form. That's not it? Well, they haven't, not directly, but my client is an architect, and he believes that architects have been at the mercy of home builders, basically doing whatever they want with copyrighted architectural plans, and he wants to make a stand. And he has, under the Copyright Act and the contract, he has the absolute right to withhold his consent to reuse of the plans unless they comply with the contract. And in his mind, they did not comply with the contract. They did not pay the reuse. So he has the right to stop them from reusing the plans. And what are the Copyright Act damages? Copyright Act damages are either statutory damages of up to $150,000 per infringement, or secondly, LGS's loss or Concordia's gain from use of the copyrighted work, which would be some portion of the profits of the homes built, plus award of attorney's fees and costs to the prevailing party. And if I may focus on this, what I think is the crux of the – I must have a dollar sign. There's your principal. If I can focus on the crux of the dispute here, I believe, is over the copyright license, in particular the express written authorization requirement. The Copyright Act, Section 106, says that a copyright owner has the right to exclusively use or authorize to use copyrighted works in certain ways, copying, distributing the work, creating derivative works, et cetera. So the Copyright Act, 106, uses the word authorize. In addition, the Ninth Circuit has held that federal copyright law provides that copyright licenses are assumed to prohibit any use that is not authorized. Again, the word authorize doesn't say anything about authorization can be unreasonably or cannot be unreasonably withheld. Then the contract in this case, again, uses the word authorization, that the plans cannot be used for additional projects without payment of the reuse fee and written authorization by the copyright owner, by LGS. And the court in S.O.S. v. Payday, 886 F. 2nd, 1081, Ninth Circuit, 1985, this court held that the chief purpose of copyright law is to protect the author and that you rely on state canons of contractual interpretation only to the extent that such rules do not interfere with the purpose of the Copyright Act. And in that case, the Ninth Circuit cited a Fifth Circuit case stating that application of state law to supply implied terms in a copyright license raises questions of preemption. Here what it appears the district court has done is implied in this copyright license a term that LGS cannot unreasonably withhold its consent to reuse of the plans. The Copyright Act doesn't state that. The Ninth Circuit doesn't state that in S.O.S. And the contract doesn't say anything about whether or doesn't restrict authorization to instances in which it's – that it cannot be unreasonably withheld. If you catch a preliminary injunction, how big a bond do you think is suitable in a case like this? Well, we haven't conducted any discovery and did not have any, certainly at the time of the preliminary injunction. But we would have sought a bond of at least $150,000 for statutory damages. But the potential bond could be – I mean, if you got the injunction and you put the bond up in favor of the builder, you'd put up a bond in excess of $150 million? No, $150,000. $150,000. Right. Which is the cap on the Copyright Act. Statutory damages. And at this point, we don't know what the actual damages would be. We don't know what their profits were on. Counsel, you've got about a minute and a quarter left. You might want to – I'd like to reserve that. Reserve. Okay. Thank you, Your Honor. May it please the Court. My name is John Naylor, and I'm counsel for Concordia Homes of Nevada. One of the first – If you enter a stipulation and agree that subject to contempt, you'd not use the plans in any further development out of this thing. Absolutely, Your Honor. Concordia would be willing to do that. The reason why that did not happen is because there's an element of this that's a little bit more than just a dispute over the $3,600 and how that's calculated. And that is, in addition to the $3,600, LGS wanted to impose an additional condition on Concordia Homes. I'd like to turn your attention to the appellant's record at ER-57, which is an email that counsel was referring to from LGS to Concordia Homes, and it says, in effect, that I'll give you permission to use these drawings if you pay me an additional $14,400, which is 3,600 times 4. And here's the critical part. If you pay me that, you shall receive permission to proceed per the licensing agreement dated July 9, 2003. Now, what had happened in this particular case is we originally had a licensing agreement dated 2001, and that had a critical provision in it that was important to Concordia Homes. That licensing agreement, under which ArborGlen I was built and under which we wanted to reuse the plans for ArborGlen II, said that LGS architects could not sell these plans or distribute them to any other developer without our permission. And, of course, that's important to Concordia because we don't want to see duplicates of our houses being built all over Las Vegas to compete with us. When we informed LGS that we wanted to reuse the ArborGlen I plans for ArborGlen II, LGS immediately came back and said, okay, you've got to pay us the 3,600 times 4 plus the per lot portion of it, and you have to accept this new term. Council? I have two questions about this. My first one relates to what you just said. I don't really see why it is that the architects have the developers over a barrel or the architects are in a position to sabotage $150 million development by holding up the developer for arguably more than the contract says. Because what I get out of reading this contract is architects are so cheap, you could just say, well, goodbye then, we'll hire another architect. And for a negligible amount of money, you've got new architect, new plans, and you proceed with your development. I understand your point, Your Honor, but I don't think that it's quite that simple. Why not? Because, frankly, just reusing the ArborGlen I drawings is much cheaper. If you wanted to bring in a completely new one. Are you talking much cheaper, like $12,000 as opposed to $18,000 on $150 million development? It's nothing. Well, let me back up for a moment. This was only about a $12 million development. But also, when you start from scratch, you've got the architect's fees, you've got the engineering fees that have to go into that, you have to run it through plan check with the county all over again, you have to run it through plan check again with the municipality that's in charge of your particular development. In the grand scheme of an $11 million development, yes, you're probably still talking about less than $100,000, but it's much more than the $15,000, $16,000 that the architect is going to choose alone. Which brings up a second point that I wanted to make. It would cost you maybe $100,000 if you fired them. To be honest with you, Your Honor, that's sort of a guess on my part. There's nothing in the record, and I really haven't looked at that particular one. Sure, you're not bound by that. I'm just trying to get an idea of the order of magnitude. Now my second question. I was thinking, why other than the money would an architect care about reuse of the plans? And I could think of a couple of things. One was, I recall back in the 50s and 60s, Levittown used to be an object of derision, and there was this folk song, or not a real folk song, a phony folk song, about Ticky Tacky. And it could hurt an architect to be associated with a house that is too reproduced. And the second thing that occurred to me is we had some tract housing built in my town. They used a plan that had been very successful for moderate price but very nice houses, low price, good houses. It had been successful in the state of Washington, and I think it had been successful in Anchorage. And they used above-ground propane tanks with pipes into the house about 15 feet long to get the heat in. Well, in Fairbanks, it goes to 50, 60 below zero, and the propane liquefies in the pipe, and the house freezes up and the pipes burst. So a good architect who knew something about the weather would not have approved them for Fairbanks. So that's two reasons, avoid the Ticky Tacky and avoid an inappropriate reuse. Why isn't the architect entitled under copyright law and under a reasonable reading of this contract to just say no? Because the contract clearly provides, and the practice between these two entities, was that they were going to reproduce these houses over and over again. That's the type of houses that these are. We're talking about 1,500 to 1,800-square-foot homes, which in the Las Vegas area is basically an entry-level home, and they were meant to be reproduced over and over and over throughout neighborhood throughout neighborhood. There's nothing particularly special about these particular homes. They become less special if there are more of them. Yes, Your Honor, but that's a point that really would be in Concordia's interest as opposed to the architect's interest. Concordia, these homes are not marketed as, look, you're buying an LGS architect home, or you're buying a home that was designed by a particular architect. At this price level and the market that Concordia was after for these particular homes is you're buying a Concordia home. So if people look out and see a vast ocean of Concordia homes that look exactly alike going down the street, the ticky-tackiness, that sort of thing, that's really going to be Concordia's problem in marketing and selling them as opposed to the architect's problem. One thing that I would like to point out is that there are no separate plans for Arbor Glen II. There is nothing in the record that supports this, and frankly, that's the first time that I've heard that particular argument. What Concordia did is they took the exact plans for Arbor Glen I and used them at Arbor Glen II. There was no reengineering. There was no redesign. There were no separate elevations or anything along those lines. So you're saying you have nothing to return except the original plans? Exactly, Your Honor. Now, granted, in some circumstances it's possible that you would be changing those drawings for a new neighborhood because the codes may have changed or in terms of getting your permitting and that sort of thing, the county or the applicable municipality may impose upon you new restrictions which would require changes in the drawings, but that simply didn't happen here, and there's no support in the record whatsoever for that. And so, in effect, we'd have to send back those drawings that were entitled to at the very least under the Arbor Glen I. If they get their injunction, is a bond of $100,000 or so adequate to secure the developer against the risk that they shouldn't get the injunction? For them to post the bond? I guess now it's all over. Well, it's all over, Your Honor, and that raises – and we aren't going to be reusing these plans, and that raises an interesting point because we would fully expect – It doesn't exactly say that. It doesn't say we won't reuse them. It says, Gidget Graham's affidavit says, Gidget does not intend to use the four plans from the agreement at any time in the future. I read that to mean we have no present intent to, and we may change our minds in the future. Well, if I could read the whole portion of it, which is our excerpt of record, which is page S.E.R. 5, paragraph 19, and it says, Concordia does not intend to use the four plans from the agreement at any time in the future. Concordia will not reproduce, prepare derivative works from, distribute, or publicly display the plans. But it doesn't say they won't use them. Granted, it doesn't, Your Honor. But I can represent to the court on behalf of my client, as I did in the district court, that we aren't going to reuse them. And I would also expect, if we go back to the trial court, if they get their injunction, and I would expect them to say that in terms of the injunction they don't have to post a bond, they would argue that the bond is going to be de minimis because we've expressed no desire whatsoever to reuse these plans, and the neighborhood's already built. So, really, we aren't at jeopardy at all in granting the injunction. There's one other aspect about the... Well, does this all come down to then whether or not Concordia ever tendered the full fee for the additional houses beyond the first 80? No, that's a factual dispute. I mean, in Gidget Graham's affidavit, the president of Concordia, she said that, in terms of tender, Your Honor, did we send them a check for the full fee? No, that did not happen. We tried to, and the affidavit states that people at Concordia tried to contact LGS, but at that point in time, communication was cut off. They basically didn't respond to us. And so, fundamentally, what is your position with respect to the agreement itself, that the agreement fully contemplated the full 181 houses, or...? The agreement contemplated additional homes. If you look at... There are a couple places in the record for that. I'm going to start first at Pellant's excerpt of record at ER 25, which is Exhibit B to the original contract. And under the first paragraph-headed project description, it says that the project is tentatively described as a single-family detached development consisting of 80 single homes. They described it as being, and it was initially, Arbor Glen 1 was approximately 80 homes. That's just tentative. They are clearly contemplating that there are going to be additional phases to this. Then, again, at ER, page ER 28 in Pellant's excerpts of records, which is the Exhibit C, up at the top, paragraph J, there you've got your reuse provision. If this agreement from the get-go is only going to be limited to those original 80 homes, you would have had no reason for a reuse provision. And as I think both... It's that same exhibit that says, the client must procure the written permission of the architect prior to the commencement of such reuse of said plan. Yes, Your Honor. It does. But... It's a promise to do nothing. I'm sorry, Your Honor? Rather illusory. What if he just withholds it? Well, you have to read it in... There's not going to be any consideration? There's not going to be any more building? There's not going to be anything? You don't have any more contract? You've just got your 81 homes. Well, and that is basically what they tried to do. I know. And we're here to consider whether or not they were entitled to do that within the language of this document. Well, you're here, Your Honor, to decide whether the trial court abused its discretion in denying the preliminary injunction. But one of the issues, of course, is whether the probability of success on the merits. So we get right to it, and that's why I'm focusing on this language. Why shouldn't we just read this to mean we can let you use the plans or not? It's totally up to us. But if we do let you reuse them, we won't be haggling with you about the price. Here's the price. That's an alternative reading, Your Honor, and I can see that there is basis in the language for that. I think, given, though, the way that these contracts operate, and particularly with the 1998 contract and the Parkhurst contract, it's contemplated that Concordia had a right to reuse those plans upon payment. Why wouldn't they negotiate a sentence that says that? I'm sorry, Your Honor? I mean, where it says here the client must procure the written permission of the architect, this is type language. It's not standard form language. They could have just as easily, if the bargaining relationship of the parties provided for it, negotiated a sentence that said that the architect is required to grant permission for reuse of the plans, provided that the reuse fee paid above is paid. That certainly would have made it more clear and would have been better, Your Honor. I don't know why the language was drafted the way it was. Thanks. Anything further? I want to make one other point with respect to the $3,600. One thing that LGS neglects to mention is that in calculating the $3,600, it's not just an issue of 3,600 times 4, but when they came back to us asking for the 3,600 times 4, they were trying to basically double charge us on two of the plans. The 2001 contract was amended twice. We have those amendments are in Concordia's supplemental excerpts of record at S.E.R. 6 and S.E.R. 7. S.E.R. 7 deals with a new Plan 3. The original contract was two plans, and then partway through, Concordia added another plan that they called Plan 3. I could see where if you sent them a check for 3,600 plus 60 times the number of units, and they sent you back a letter not quarreling at all with the suitability of the plans for the new phase of the development, and just saying 3,600 wasn't good enough. They wanted 3,600 times 2, times 4, times 8, whatever. Conceivably, a court might enjoin them, commanding them to give permission. Yes. But that didn't happen. I don't understand your point, Your Honor. I mean, that didn't happen, or that the court didn't do that, or that we – Well, you never made that kind of tender. Correct, Your Honor. I mean, we didn't formally tender a particular check. The first time we did it, and it was admittedly a mistake, we only did the 8 unit. They demanded too much. You tendered too little. That's what happened, Your Honor. The Second Amendment – well, in the First Amendment, which is SCR 7, we paid for that, and that's acknowledged. And then SCR 6 is Plan 103, which was never intended to be in Arbor Glen 1. That was designed specifically for Arbor Glen 2. And we also paid for all the architectural work and all the engineering on that particular plan. So those are two of the plans. So in addition to the additional terms that they wanted to impose on us, they wanted to charge us all over again for Plan 3 and Plan 103. In conclusion, it basically – I respectfully remind the court again that this is an abuse of discretion standard and that the facts – the trial court found that they just do – simply do not have a likelihood of success on the merits in this particular matter, and there is support in the record to support that finding. And, therefore, the trial court did not abuse its discretion to request that we uphold the trial court's ruling. Thank you, counsel. Mr. McHugh, you have a little bit of time left. Very briefly, Concordia's argument essentially ignores the express written authorization requirement in the contract, and that's in the contract in two different places, in the standard American Institute of Architects standard contract that's part of this, and also in that separately negotiated addendum. So, basically, they're reading out of the contract that provision. Secondly, knowing that the copyright owner here was objecting to their reuse of the plans, apart from the dispute over the amount of money, they went ahead and proceeded without express written authorization and against LGS's warnings that what they were doing constituted copyright infringement. On page 7 of our brief, we refer to several different warnings – I think there are four – that LGS gave that you're not authorized to proceed with building these units. Don't do that. It's copyright infringement unless we resolve this dispute. And they could have gone to court and they could have gotten an order that said, LGS, you're wrong. We're allowed to proceed. They didn't. They're basically taking their copyright license, doing what they want with it, using the copyrighted works outside the scope without any recourse, or without any – over the objection of LGS. Secondly, regarding this issue of there's no separate plans, there's nothing in the record that says one way or the other way whether there were any separate plans or new plans for ArbGlenn 2. That's actually the first I've heard that there are no separate plans or nothing was modified. But if that's the case, they should still be enjoined from using the original plans for the new units because that clearly was not contemplated within the original contract. Thank you, Counselor. Your time has expired. The case just argued will be submitted for decision and the Court will adjourn.
judges: Beezer, O'scannlain, Kleinfeld